UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-80162-CIV-HURLEY

**ERIC KAPLAN and BONNIE KAPLAN,**
 plaintiffs,

vs.

**BLUE CROSS AND BLUE SHIELD
OF FLORIDA, INC.,**
 defendants.
_____/

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT & DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

 Plaintiffs Eric Kaplan and Bonnie Kaplan, husband and wife, sued Blue Cross and Blue Shield of Florida, Inc., and asserted that it wrongfully denied their claims for medical benefits under a group policy plan provided by Bonnie Kaplan's employer, the Batt Private School, Inc..

 The Kaplans' claims arise under and relate to an employee welfare benefit plan as defined by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(1) ("the plan"). Blue Cross and Blue Shield of Florida, Inc. ("Blue Cross") is both plan administrator and insurer of benefits under the plan.

### Facts & Procedural History[1]

 In late 2003, Bach McComb, a one-time osteopath who had lost his license to practice in

---

[1] The recited facts are drawn from the affidavits, exhibits, answers, and administrative record on file, interpreted in a light most favorable to the plaintiffs for the purposes of this summary judgment proceeding.

Florida[2], began treating Bonnie and Eric Kaplan with injections of "BOTOX® Cosmetic"at the Advanced Integrated Medical Center in Fort Lauderdale, Florida. "BOTOX® Cosmetic" is an FDA-approved wrinkle reduction formula derived from botulinum toxin Type A manufactured by Allergan Pharmaceuticals. The Kaplans both concede that they sought the Botox injections for wrinkle reduction and purely cosmetic purposes.

After receiving several injections from McComb without incident,[3] on November 24, 2004, the Kaplans suffered catastrophic injuries when McComb substituted a Botox "knock-off," a research grade toxin also derived from the botulinum toxin Type A which did not have FDA approval for human use, and incorrectly diluted the solution before injecting it in the Kaplans. McComb contemporaneously injected himself and his own girlfriend, Alma Hall, with the research grade solution, and all four individuals suffered severe physical injuries as a result.[4]

---

[2] The record is not clear as to whether the plaintiffs were aware of McComb's license status at the time they submitted themselves to treatment. According to the allegations of the plaintiffs' state court negligence complaint, McComb was an osteopath who had lost his license to practice in Florida at the time of treatment, while he nevertheless held himself out to the public and plaintiffs as being a person "capable of and able to, undertake the duty to the Kaplans of providing cosmetic services, including Botox injections, in accordance with reasonable standards of care by reasonably prudent similar providers of cosmetic services." [State Court Complaint, p. 7 ¶ 7].

[3] See Final Order of State of Florida Division of Administrative Hearings dated January 6, 2006, adopting and approving Findings of Fact set forth in State of Florida Division of Administrative Hearings Recommended Order dated June 21, 2005. The Findings of Fact, at pages 10-18, establish that the Kaplans treated with Bach McComb for Botox injections on at least three separate occasions between November 20, 2003 and November 24, 2004 without complications.

[4] Bach McComb was later indicted for "misbranding," i.e causing, with intent to defraud or deceive, a misbranded drug to be introduced into interstate commerce in violation of 21 U.S.C. § 331 (a). He pled guilty to this charge and was sentenced to 36 months in federal prison. In addition to the criminal charges brought against McComb by the United States, the Kaplans filed civil suit against McComb and others in state court for negligence and strict liability.

The Kaplans submitted approximately $800,000.00 in resulting hospital and medical bills to Blue Cross for payment under the plan. After reviewing their medical files, Blue Cross denied all claims, finding that the November 24, 2004 injections were uncovered "cosmetic services," and that the injuries which resulted from the injections were uncovered complications of non-covered health care services under the express terms of the plan. The Kaplans took an administrative appeal, and the Blue Cross PPO appeal panel, after further review of the file, including consultation with three medical experts, affirmed the original denial of claim.

This ERISA action ensued, and the case is now before the court upon the parties' cross motions for summary judgment.

## Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. 56©. The moving party bears the stringent burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp v Catrett,* 477 U.S. 317, 106 S. Ct. 2548, 91 L .Ed. 2d 265 (1986). To discharge this burden, the movant must show that there is an absence of evidence to support the nonmoving party's case. *Id.* At 325, 106 S. Ct. 2548.

Once this initial burden is met, the burden of production shifts and the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v Zenith Radio Corp.,* 475 U.S. 574, 106 S. Ct. 1348 (1986). The non-moving party cannot rest on mere allegations or denials of the adverse party's pleadings, but instead must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*,

475 U.S. at 587. A mere "scintilla" of evidence will not suffice; there must be a showing sufficient to allow a jury to reasonably find for that party. *Walker v Darby*, 911 F.2d 1573 (11th Cir. 1990).

## ERISA Cases

In the ERISA context, when a plan gives a claims administrator discretion to deny a claim, but it acts under a conflict of interest, the reviewing court must apply a heightened arbitrary and capricious standard of review.[5] *Buckley v Metropolitan Life*, 115 F.3d 936, 939 (11th Cir. 1997). Under this standard, the court first decides if the claims administrator's decision is "wrong." *Godfrey v BellSouth Telecomm., Inc.*, 89 F.3d 755 (11th Cir. 1996). A decision is "wrong" if the court, after its initial *de novo* review, ultimately disagrees with the decision. *HCA Health Servs of Ga., Inc. v Employers Health Ins. Co.*, 240 F.3d 982, 993 n. 23 (11th Cir. 2001). If the claim decision was not "wrong," then the inquiry is over and the Court affirms the administrator's decision. *Williams v Bellsouth Telecomm. Inc.*, 373 F.3d 1132 (11th Cir. 2004).

However, if the Court disagrees with the plan administrator's interpretation of the plan, it must then decide if its decision was nonetheless reasonable (i.e. not arbitrary and capricious). *Lee vs Blue Cross Blue /Shield of Alabama*, 10 F.3d 1547 (11th Cir. 1994). A "wrong but reasonable interpretation is entitled to deference," even though the claimant has also proffered a reasonable interpretation. *HCA Health Services*, 240 F.3d at 994. This standard applies both to the

---

[5] In cases where a plan administrator is not granted any discretion over distribution of benefits in an ERISA plan, the court applies a *de novo* standard of review. *Yochum v Barnett Banks, Inc. Severance Pay Plan*, 234 F.3d 541 (11th Cir. 2000). If the plan administrator is granted discretion, the Court applies the "arbitrary and capricious" standard." *Id.* Finally, as here, if the plan grants the administrator discretion, but the administrator operates under a conflict of interest, the court applies a "heightened arbitrary and capricious" standard of review. *Id.*

4

interpretation of the policy language and factual determinations of the administrator. *Torres v Pittston Co.*, 346 F.3d 1324, 1332 (11th Cir. 2003).

If the decision is wrong but reasonable, the burden is then on the claims administrator to show the decision was not tainted by self interest. *Brown v Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556 (11th Cir. 1990). To discharge this burden the administrator must show that its "wrong but reasonable interpretation of the plan benefits the class of participants and beneficiaries." *HCA* at at 995. If the claims administrator fails to make this showing, its decision will not be entitled to deference. If the administrator meets this burden, the claimant may then "show by other measures that the administrator's decision was arbitrary and capricious." *Brown,* 898 F.2d at 1566.

Under either the arbitrary and capricious or heightened arbitrary and capricious standard, a court reviewing an ERISA claim decision may "look only to the facts known to the administrator at the time the decision was made." *Lee*, 10 F.3d at 1550, *citing Jett v Blue Cross and Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir. 1989). Accordingly, this court's review in this summary judgment proceeding is confined to the administrative record as it existed at the time Blue Cross denied the Kaplans' claim.

### **The Plan**

In this case, the provisions of the plan clearly establish Blue Cross' discretionary authority to review claims and determine eligibility for benefits. In this respect, the plan recites "We [Blue Cross] are solely responsible for determining whether expenses incurred for medical care are covered under this Booklet" [Plan, p. 4-1], and that "We will determine whether services are covered services under this booklet....after we have received a claim for the services." [Plan, p. 2-1]. It also provides that "[in] order for Health Care Services to be covered under this Booklet, such

Services must meet all of the requirements to be a Covered Service, including being Medially Necessary, *as defined by us.*" [Plan 4-1] [emphasis added].

Finally, "medically necessary" or "medical necessity" is defined to mean

[I]n accordance with our [Blue Cross] guidelines and criteria then in effect, for coverage and payment purposes only, that a Health Care Service is required for the identification, treatment or management of a Condition, and is, *in the opinion of* [Blue Cross]:

(1) consistent with the symptom, diagnosis, and treatment of the condition being treated
  ...
(4) not experimental or investigational;
(5) not for cosmetic purposes;
  ....

[Plan, 23-7, 23-8] [emphasis added]. With this predicate, Blue Cross plainly had discretion to interpret the policy and deny claims. *Lee v Blue Cross / Blue Shield of Ala.*, 10 F.3d 1547 (11th Cir. 1994).

Since Blue Cross was responsible for paying claims as well as exercising its discretion to determine their validity, Blue Cross concedes, and the court agrees, that Blue Cross acted under a conflict of interest. *See Brown*, 898 F.2d at 1561. The heightened arbitrary and capricious standard of review therefore applies to Blue Cross's denial of the Kaplans' claim. Within this framework, the court first turns to the issue of whether Blue Cross's decision to deny benefits was "wrong."

The plan covers various categories of "Health Care Services." "Cosmetic Services," however, are excluded from the general extension of coverage.

"Cosmetic Services" are defined by the plan to include:

[A]ny service to improve the appearance or self perception of an individual (except as covered under the Breast Reconstructive Surgery category) including without limitation: cosmetic surgery and procedures or supplies to correct hair loss or skin wrinkling (e.g. Minoxidil, Rogaine, Retin A) and hair implants/transplants.

[Plan, 3-1].

The Plan also excludes coverage for health care services rendered in connection with "Complications of Non-Covered Services," which the plan defines to include "the diagnosis or treatment of any condition which is a complication of a non-covered Health Care Service (e.g. Health Care Services to treat a complication of cosmetic surgery are not covered)." [Plan Booklet, p. 3-1].

### Cross Motions for Summary Judgment

Blue Cross contends that the injections to which the Kaplans subjected themselves on November 24, 2004 constitute "cosmetic procedures" which are expressly excluded from coverage, and that the physical injuries which resulted are necessarily excluded from coverage as "complications" of those non-covered procedures.

The Kaplans concede they sought Botox® injections from Bach McComb purely for cosmetic reasons, and agree that the plan explicitly excludes coverage for "cosmetic services." However, they contest Blue Cross' interpretation of the term "cosmetic service," as well as its corresponding factual determination that their medical complications arose out of non-covered "cosmetic services" or procedures. The Kaplans contend that McComb's unlawful act of injecting them with a substance not intended for human use cannot logically fall under the plan's definition of a "cosmetic service," and that the physical injuries they suffered – which

they view as consequences of a criminal act – should therefore not be classified as "complications" of a "cosmetic service." Put more bluntly, the Kaplans assert that McComb committed an assault and battery upon their persons. Thus, they say, the plan should cover the medical treatment needed to treat their resulting injuries, just as if they had been victims of an armed robbery which might have occurred in the parking lot of McComb's offices.

Blue Cross responds that the exclusionary provisions of the plan do not distinguish between medical complications resulting from negligently performed "cosmetic services" and those arising out of "cosmetic services" rendered in conjunction with some criminal act, be it a federal "misbranding" violation or a technical common law assault and battery. Thus, Blue Cross contends that the exclusionary language at issue is reasonably interpreted to encompass a categorical exclusion of all "cosmetic procedures" and attendant complications arising from such procedures.

## Discussion

The court is confined to examination of the plan documents and administrative record in determining whether Blue Cross' interpretation of the plan is wrong. *HCA Health Services of Georgia, Inc. v. Employers' Health Insurance Co.*, 240 F.3d 982 (11th Cir. 2001); *Lee v. Blue Cross Blue /Shield of Alabama*, 10 F.3d 1547 (11th Cir. 1994).

The record clearly shows that the Kaplans voluntarily submitted themselves to a "cosmetic procedure." Under the plan, a "cosmetic service" is specifically defined to include a "cosmetic procedure ... to correct ... skin wrinkling ...," and the Kaplans concede they sought the injections in order to improve their wrinkles and obtain a more youthful appearance.

The question remains, however, whether McComb's decision to utilize a non-approved, research-grade botulinum toxin – an act which may well amount to a technical assault and battery – without their consent transformed his act into something other than a "cosmetic procedure" within the meaning of the plan's exclusion. After thoughtful consideration, the court concludes this question should be answered in the negative.

As a general matter, where the plaintiff's claims are based on breach of a professional standard of care, and the alleged tortious activity involves a medical judgment which is substantially related to medical diagnosis or treatment of the patient, then the action is considered one for "medical malpractice" [6]– regardless of whether the claim may be attended by some other independent criminal activity. *Compare Paulk v National Medical Enterprises, Inc.*, 679 So.2d 1289 (Fla. 4th DCA 1996)(action charging hospital with extending patient stays without medical necessity alleged "claim for medical malpractice" for purposes of triggering statutory pre-suit investigation requirements, despite attendant claims for fraud and civil RICO violations ) *with Buchanan v Lieberman*, 526 So.2d 969 (Fla. 5th DCA)(medial malpractice statute of limitation did not apply to battery action arising out of doctor's alleged sexual assault of patient in medical offices, absent any allegation that act was perpetrated under guise of medical diagnosis, treatment or care), *rev. den.*, 536 So. 2d 244 (Fla. 1988).

---

[6]

*See generally Trimel v Lawrence & Memorial Hosp. Rehabilitation Center*, 61 Conn. App. 353, 764 A.2d 203(Conn. App. 2001)(relevant considerations in determination of whether claim sounds in medical malpractice or ordinary negligence are whether defendants acted in capacity as medical professionals; whether alleged negligence is of specialized medical nature that arises out of medical professional patient relationship, and whether alleged negligence is substantially related to medical diagnosis or treatment and involved in exercise of medical judgment.)

Employing this analytical paradigm here, the court finds that the alleged lack of informed consent – due to fact that McComb allegedly used a research grade of the toxin without the Kaplans' knowledge rather than the FDA approved Botox Cosmetic® —fails to convert McComb's action into the intentional tort of assault and battery. McComb's selection of the substance to be injected involved the exercise of medical judgment, and any departure from the prevailing standards of care that he may have made in the exercise of that judgment, however gross or reckless, is aggravated negligence and perhaps medical malpractice -- not the crime of intentional assault and battery. *See Aromin v State Farm Fire & Casualty Co.,* 908 F.2d 812 (11th Cir. 1990)(Fla. law) (recognizing distinction between "technical" civil assault and battery, and criminal assault and battery, with the latter requiring affirmative, intentional act directed at another person); *Romatowski v Hitzig*, 227 A.D.2d 870, 643 N. Y. S. 2d 686 (N. Y. A. D. 3d Dept. 1996)(where scalp reduction procedure was performed with actual consent of patient, any alleged lack of informed consent is medical malpractice and not intentional tort of assault and battery). [7]

Thus, the court rejects the view that the alleged lack of informed consent transformed the Kaplans' anti-wrinkle Botox injections from non-covered "cosmetic services" into covered criminal batteries upon their persons. The resulting injuries which arose from those services, accordingly, were correctly classified by the plan administrator as "complications" of non-covered

---

[7]Under the most favorable view of the evidence from the Kaplans' perspective, McComb's judgment was grossly negligent and perhaps horribly reckless; however, the evidence is not susceptible to reasonable inference that he possessed criminal intent to harm the Kaplans. That he lacked an affirmative intent to harm the Kaplans is evident from the fact that he injected himself and his girlfriend from the same batch of toxin that he injected into the Kaplans.

10

health care services. [8]

In short, McComb's decision to use a research grade of the botulinum toxin Type A product instead of the more expensive FDA- approved "BOTOX ® Cosmetic" involved the exercise of a professional medical judgment, and this judgment was substantially related to the cosmetic procedure which he performed on the Kaplans. However substandard his judgment may have been, it does not convert his act into an intentional assault and battery nor defeat the inherent nature of his act as one involving the rendition of a health care service which meets the plan's definition of a "cosmetic service."

## Conclusion

Based on the foregoing analysis, the court finds Blue Cross correctly interpreted the plan and correctly characterized the subject health care services as those rendered to treat complications of non-covered "cosmetic procedures." This ends the inquiry under ERISA, requiring the court to affirm the decision of the plan administrator. [9]

---

[8] While it might reasonably be argued that by substituting a research grade botulinum toxin for the FDA approved BOTOX ® Cosmetic product, McComb essentially performed a medical experiment on the Kaplans without their informed consent, this interpretation would not remove McComb's activity from the ambit of a "cosmetic procedure," and it would possibly trigger an additional plan exclusion for "experimental or investigational" services [Plan, 3-2] as an independent coverage bar.

[9] Even if the decision were deemed to be wrong, applying a heightened arbitrary and capricious standard of review, the court would still find that Blue Cross had a reasonable basis for denying the Kaplans' claim. *See e.g. Manny v Central States, Southeast and Southwest Areas Pension and Health and Welfare Funds*, 388 F.3d 241 (7th Cir. 2004)(trustees acted reasonably under ERISA by denying, under cosmetic care exclusion, coverage for all gastric bypass surgeries); *Kraut v Wisconsin Laborers Health Fund*, 992 F. 2d 113 (7th Cir. 1993)(determination that exclusion for reconstructive surgery excluded coverage for orthognathic surgery was not arbitrary or capricious, even though surgery not performed wholly for cosmetic purposes).

Thus finding no genuine issue of material fact pertaining to the coverages at issue, and having further concluded that Blue Cross' decision to deny benefits was not wrong, it is

**ORDERED AND ADJUDGED:**

1. Defendant Blue Cross Blue Shield of Florida Inc's motion for summary judgment [DE# 9] is **GRANTED.**

2. The plaintiffs' cross motion for summary judgment [DE# 17-2] is **DENIED.**

3. The court will separately enter final judgment in favor of Blue Cross.

**DONE AND SIGNED** in Chambers at West Palm Beach, Florida this 9th day of March, 2007.

                                                   _____
                                                             Daniel T. K. Hurley
                                                       United States District Judge

cc. All counsel

For updated court information, visit unofficial Web site at http://us.geocities.com/uscts